## UNITED STATES v. LEKACOS et al.

### No. 2-302.

Circuit Court of Appeals, Second Circuit.

Aug. 7, 1945.

Writ of Certiorari Granted Nov. 13, 1945.

See 66 S.Ct. 169.

Henry G. Singer, of Brooklyn, N. Y., for Kotteakos and Lekacos.

Herbert Zelenko and Weinberger & Weinberger, all of New York City (Harry M. Weinberger, of New York City, of counsel), for appellant Nathan Regenbogen.

Vine H. Smith, Asst. U. S. Atty., and Miles F. McDonald, U. S. Atty., both of Brooklyn, N. Y., for the United States.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

Lekacos, Kotteakos and Regenbogen appeal from a judgment of conviction for a conspiracy to make fraudulent applications for loans under the National Housing Act, contrary to §§ 1702, 1703, 1715 and 1731 of Title 12, U.S.C.A. They raise only two points: (1) A material variance between the indictment and the evidence, in that the indictment was for a single conspiracy, and the evidence proved eight or ten separate and independent conspiracies; (2) an error in the judge's charge when he instructed the jury that they could convict only in case they found that there had been a single conspiracy; which, if true, should have led him to dismiss the indictment. The evidence was such that the jury might have found the following facts. One, Simon Brown, who was indicted with the thirty-one others, among whom were the three appellants, was president of a building company in Brooklyn, for which in 1928 he obtained loans from a bank under the National Housing Act, to aid in the construction of twelve houses which his company was building. For reasons which are irrelevant to this prosecution, and which in any event do not very definitely appear, this experience suggested to him a profitable opening for acting as a broker for other borrowers, about one hundred and ten loans in all, whom he charged a commission. He personally submitted to the same bank all the applications which were in the names of the borrowers—in one or two the names were fictitious—and ordinarily he received the cheques which were made payable to the applicants. The applications proposed uses for the money which were among those prescribed by the National Housing Act, but the uses actual-

ly intended were quite different, and the applications were therefore fraudulent. Lekacos, hearing from Brown that he was for the moment no longer in the building business, but was securing loans for others, told Brown that he would like a loan "to open up a law office," and, when Brown asked him what use should be declared in the application, Lekacos told him to say that it was for redecorating and painting a house of Lekacos's mother. Brown prepared such an application and Lekacos got the money. Later Lekacos borrowed more money, this time upon a fraudulent application in the name of his brother. Kotteakos and Regenbogen—who were partners in the cigarette and pin-ball machine business—had no connection with either of Lekacos's loans. Lekacos introduced Kotteakos to Brown, and he, and later Regenbogen, obtained personal loans upon fraudulent applications. Thereafter the two acted as intermediaries between Brown and other applicants, who filed applications, to the frauds in which both were privy.

These were the facts on which the three appellants were found guilty; but the evidence was not confined to their dealings with Brown; it covered similarly fraudulent applications of many of the other accused, who, as we have said, may be divided into at least eight, and perhaps more, separate and independent groups, none of which had any connection with any other, though all dealt independently with Brown as their agent. Nothing said by Brown about any of the other groups concerned the three appellants; and in this we include not only the acts which he imputed to the others, but any declarations which he put in their mouths. The other important evidence of the prosecution—with the exception of some not very important testimony of two others of the accused who like Brown turned state's evidence—consisted of the testimony of workmen who were said to have done work on the buildings of some of the applicants and of investigators of the Federal Housing Authority, who had examined the uses to which the applicants had in fact put the borrowed money, which they found to have been different from those stated in the applications. Of this testimony that part which showed the discrepancy between the declared uses and the disposition of the money in the cases of other applicants than the three appellants, was wholly irrelevant to establish discrepancies which tended to prove the frauds in the appellants' applications.

■■■ All this evidence the judge admitted, because he believed that it was relevant to the proof of a single conspiracy although the accused objected, and demanded that only that evidence which was relevant to the applications of any one group should be admitted against that group. The judge quite naturally also carried over his understanding of the case into his charge. At the outset he told the jury that the "indictment charges but one conspiracy, and to convict each of the defendants of a conspiracy the Government would have to prove, and you would have to find, that each of the defendants was a member of that conspiracy. You cannot divide it up. It is one conspiracy, and the question is whether or not each of the defendants, or which of the defendants, are members of that conspiracy." Later on he said that the question was whether all the accused were "moved by a common purpose to get money by violating the law"; that, if so, those who entered the conspiracy at a later date were responsible for what had gone on before; and that the jury might consider the acts and declarations of any of the conspirators as evidence against all those who were in the conspiracy. He was plainly wrong in supposing that upon the evidence there could be a single conspiracy; and in the view which he took of the law, he should have dismissed the indictment. He was apparently misled by an erroneous understanding of the rule that, when anyone joins an existing conspiracy, he takes it over as it is, and becomes a party to it in its earlier phases, and that the declarations of other conspirators, even though made before he has entered, are competent against him. What he failed to remember was that to bring this rule into operation it is not enough that, when one joins with another in a criminal venture, he knows that his confederate is engaged in other criminal undertakings with other persons, even though they be of the same general nature. The acts and declarations of confederates, past or future, are never competent against a party except in so far as they are steps in furtherance of a purpose common to him and them. Declarations are no different from other acts; they become competent only when they are uttered in order to accomplish the common pur-

pose. In the case at bar, we assume that Lekacos and Kotteakos and Regenbogen knew that Brown was for the time being acting as a broker for a number of other persons, who were getting loans in fraud of the Act, and who were making false representations to the bank like those which they themselves were making. But that was not enough to make them confederates with the other applicants; it did not give them any interest in the success of any loans but their own; there was no interest, no venture, common to them and anyone else but Brown himself. Thieves who dispose of their loot to a single receiver—a single "fence"—do not by that fact alone become confederates: they may, but it takes more than knowledge that he is a "fence" to make them such. United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128; United States v. Peoni, 2 Cir., 100 F.2d 401. In Silkworth v. United States, 2 Cir., 10 F.2d 711, the accused were all parties to the enterprise and the decision was clearly right, although some of the language in the opinion was not altogether clear; so far as it must be read as contrary of what we have just said, it is overruled.

 It does not follow however that this error even though continued into the charge made the trial unfair. Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314, authoritatively settled the law that to combine several conspiracies in one indictment was not fatal to a conviction unless it in some way prejudiced the rights of the accused; and the circuit courts of appeals have repeated that ruling in many later cases. We collected them in United States v. Cohen, 2 Cir., 145 F.2d 82, 89, where we followed the doctrine, and we have followed it again in United States v. Rosenberg, 150 F.2d 788. If the several conspiracies could have been joined as separate counts in one indictment, obviously the objection is purely formal; and in the case at bar they could. The fact that Brown was the only accused who was a party to all the conspiracies would not affect the propriety of their joinder. United States v. Twentieth Century Bus Operators, 2 Cir., 101 F.2d 700; United States v. Smith, 2 Cir., 112 F.2d 83, 85; United States v. Tuffanelli, 7 Cir., 131 F.2d 890; United States v. Liss, 2 Cir., 137 F.2d 995, 998; United States v. Cohen, supra, 145 F.2d 82. Plainly the indictment alleged "acts or transactions of the same class of crimes" § 557, Title 18, U.S.C.A., so that the only question remaining is whether it was "proper" to join them, which means whether the joinder prejudiced the three appellants. They allege generally that the joinder did in fact do so, but they specify nothing in detail, nor can we see anything which could have injured them appreciably. As we have said, nothing in Brown's testimony about the other accused tended even in the slightest way directly to implicate them in the other frauds or to predispose the jury to connect them with the other applicants.

The guilt of the three appellants turned upon whether they had deliberately misstated their intent when they borrowed the money. The applications were in evidence and were undisputed; the evidence as to how they had spent the money depended upon the testimony of the investigators and of workmen; certainly the testimony that other applicants had used the money otherwise than they had stated that they intended, could not have persuaded the jury that the appellants had done the same thing with their money. The real crux was as to their transactions with Brown, and the only possible indirect prejudice that they could have suffered from the joinder was in case the jury would be more ready to accept what he said as to his dealings with them because of any testimony as to his dealings with other applicants. The mere fact that Brown himself swore to transactions with other applicants did not tend to confirm what he said about the appellants; indeed, that may have made his testimony, if anything, less likely. It is true that, so far as other witnesses confirmed his story as to his transactions with other applicants, the jury might have been disposed to find more credible the story of his dealings with the appellants. There was such testimony; it was as follows. One Dvorkin, swore to what took place between Brown and another of the accused, Posner. That may have tended to confirm Brown's credibility generally, although the jury disagreed as to Posner. Gerakeris and Isaac Roth swore to transactions between Brown and Lekacos: again this may have added to Brown's credibility with the jury, though obviously it was an objection good only in the mouths of Kotteakos and Regenbogen. Finally, Shapiro, Brown's secretary, confirmed Brown's testimony as to transactions between himself and Kotteakos and Regenbogen: only Lekacos could have objected

to this. These are the only instances we have found in which these three appellants could possibly have been prejudiced by testimony not admissible, if the conspiracies had not been joined: and, to repeat, any conceivable damage must be confined to the possibility that confirmation of what Brown said on other occasions might help to establish his general credibility.

 We do not think that that possibility made the joinder "improper." The fact that two crimes are prosecuted at the same time involves, ex necessitate, the possibility of confusion, because testimony relevant to one crime may gain credibility from testimony relevant only to the other. A counsel of perfection might insist upon absolute separation; but Congress clearly has not meant to insist upon that. It is only when the testimony relevant to one of the crimes so deeply stains and generally impugns the accused, as to give genuine plausibility to the chance of prejudice, that the joinder becomes "improper." It is idle to insist that to balance that chance against the public burden involved in a multiplicity of trials, is to invade the jury's functions. The control of judges over juries at common law presupposes exactly that power; it assumes that juries are less competent, because less experienced than judges, to shake off irrelevancies, and to remain detached. There would have been no law of evidence otherwise. That presupposition and that assumption may be wrong; and in a world where the powers of judges shall not be so great, it may disappear; but with it will go many centuries of history. We hold that in the case at bar, especially since guilt was so manifest, it was "proper" to join the conspiracies, and that to reverse the conviction would be a miscarriage of justice.

 There remains only the question of the court's error in directing the jury that they must find that there was one conspiracy, or that they should acquit all. That was of course an error, as we have said, but it favored the accused. To suppose that these appellants suffered from it we should have to say that, if the judge had told the jury that they could convict any of the three for conspiring with Brown alone, they might have acquitted one or more of them, in spite of the fact that they convicted them all of a conspiracy with Brown and the other applicants. That is incredible; indeed, it is nonsense. Brown being the only liaison between the appellants and the other applicants, the jury could not rationally have drawn the appellants into the net with all the others, unless they had believed that the appellants and Brown had conspired together. The rest was surplusage, which may be disregarded.

Judgment affirmed.